1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                      FOR THE DISTRICT OF OREGON

10

11  LAUREL ANN LEMKE,                )
                                     )    No. CV 07-1363-HU
12              Plaintiff,           )
                                     )
13       v.                          )
                                     )    FINDINGS AND
14  MICHAEL J. ASTRUE,               )    RECOMMENDATION
    Commissioner, Social             )
15  Security Administration,         )
                                     )
16              Defendant.           )
    ─────────────────────────────────)
17
    Merrill Schneider
18  P.O. Box 16310
    Portland, Oregon 7292
19  Linda Ziskin
    3 Monroe Parkway, Suite P, PMB # 323
20  Lake Oswego, Oregon 97035
         Attorneys for plaintiff
21
    Karin J. Immergut
22  United States Attorney
    District of Oregon
23  Britannia Hobbs
    Assistant United States Attorney
24  1000 S.W. Third Avenue, Suite 600
    Portland, Oregon 97204
25  Franco L. Becia
    Special Assistant United States Attorney
26  Office of the General Counsel
    Social Security Administration
27

28  FINDINGS AND RECOMMENDATION Page 1

701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
     Attorneys for defendant

HUBEL, Magistrate Judge:

     Laurel Lemke brings this action pursuant to 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for Social Security Disability (SSDI) benefits.

### Procedural Background

     Ms. Lemke filed an application for SSDI and Supplemental Security Income (SSI) benefits on December 14 and 15, 2004. She alleges disability since March 27, 2004, from back pain, memory loss and depression. Her application was denied initially and on reconsideration. A hearing was held on November 9, 2006, before Administrative Law Judge (ALJ) Howard K. Treblin. On January 25, 2007, the ALJ issued a decision finding Ms. Lemke not disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

     Ms. Lemke was 44 years old at the time of the ALJ's decision. She did not attend high school. Her past relevant work is as a convenience store clerk, a deli clerk, and a restaurant manager.

### Medical Evidence

     In 1985 or 1986, or possibly 1995,[1] Ms. Lemke was injured

---

     [1] Ms. Lemke's reports to physicians have differed on the date. See, e.g., tr. 290 (accident occurred in 1985); tr. 264 (accident occurred in March 1986); and tr. 151 (accident occurred in 1995).

FINDINGS AND RECOMMENDATION Page 2

1 when, standing outside her car after a motor vehicle accident, she
2 was hit by another car. She has described her injuries from that
3 accident somewhat inconsistently, saying on one occasion that she
4 sustained a pelvic fracture, right foot dislocation, and head
5 laceration, tr. 290; on another occasion that she sustained a
6 pelvic fracture, right foot dislocation, closed head injury, and
7 crush injury to one of her legs, tr. 278; on another occasion that
8 she sustained a pelvic fracture, head injury, and multiple injuries
9 to the right leg, tr. 237; on another occasion that she had
10 multiple pelvic fractures and soft tissue trauma to her right leg,
11 tr. 350; and on yet another occasion that she sustained a pelvic
12 fracture, right foot fracture, and fractured nose. Tr. 264. The
13 record contains no medical evidence pertaining to the accident.

14 In the spring of 2002, Ms. Lemke sought treatment from Oregon
15 Health Sciences University for chronic low back and right leg pain
16 which Ms. Lemke attributed to the accident. See, e.g., tr. 290.

17 On April 10, 2002, Ms. Lemke saw Karen Muchowski, M.D., for
18 a full physical examination and to establish care. Tr. 255. Ms.
19 Lemke was taking anti-inflammatories on a daily basis, but found
20 her pain intolerable about three days out of the month, and said
21 she was wondering whether there was any other medication she could
22 take. Id.

23 She related episodes in which her legs went numb for a couple
24 of seconds, as well as weakness and difficulty moving her right
25 foot. Id. Ms. Lemke also reported having depression, for which she
26 had been started on Effexor about six months previously. Id. Dr.

27

28 FINDINGS AND RECOMMENDATION Page 3

1  Muchowski thought she was taking excessive amounts of NSAIDS, and
2  recommended addressing the chronic pain by treating the depression.
3  Tr. 256. Dr. Muchowski increased Ms. Lemke's Effexor dosage and
4  gave Ms. Lemke a non-refillable prescription for Vicodin. Id. On
5  April 18, 2002, Ms. Lemke asked Kar-Yee Wu, M.D., another doctor at
6  Dr. Muchowski's clinic, for more Vicodin, but this request was
7  denied. Tr. 252.

8      On May 10, 2002, Ms. Lemke returned to Dr. Muchowski. Tr. 249.
9  Ms. Lemke told Dr. Muchowski that normally her back pain flared up
10 about once a month for a couple of days, but that the latest flare
11 had lasted three to four weeks. Id. She described pain on the right
12 side over the buttocks, sometimes into the back of the leg, and
13 numbness into both legs. Ms. Lemke said she found it difficult to
14 complete her shift at work. Id.

15     Upon examination, the spinous processes over the lumbar spine
16 were nontender, and there was no paraspinous muscle tenderness in
17 the lumbar area. Id. There was some tenderness over the right
18 piriformis muscle. Deep tendon reflexes were symmetrical. Ms. Lemke
19 could walk on her heels, but had some difficulty walking on both
20 toes secondary to pain. Sitting straight leg raise was positive on
21 the right for a pulling sensation, but no numbness. Id. Dr.
22 Muchowski diagnosed chronic low back pain with some features of
23 sciatica.

24     At Ms. Lemke's request, Dr. Muchowski referred her to an
25 orthopedist, Nels Carlson, M.D. Id. Ms. Lemke was given a
26 prescription for Vicodin and told to take no more than two every
27
28 FINDINGS AND RECOMMENDATION Page 4

1  four hours. She was also advised to continue regular exercise. Id.

2      Ms. Lemke saw Dr. Carlson on May 31, 2002. Tr. 290. Ms. Lemke

3  told Dr. Carlson that she had back pain radiating down the right

4  side which had become worse during the previous six months. Tr.

5  291. She also reported intermittent bilateral lower extremity

6  paresthesias and some right leg weakness. Id. She said her symptoms

7  were better with medication and worse with activity. Id. Dr.

8  Carlson's examination revealed that Ms. Lemke's gait was

9  nonantalgic with normal coordination. Tr. 291. She was able to walk

10 on heels and toes with good distal strength. Id. She was able to

11 transfer independently to the exam table. Id. Sensation was intact

12 to pinprick. Motor strength initially showed give-way weakness in

13 the right ankle dorsiflexors, but with repeated testing, Ms. Lemke

14 appeared to have full 5/5 strength at the L2 through S1 myotomes

15 bilaterally, including the right ankle dorsiflexors. Id. There was

16 no apparent instability with active range of motion throughout the

17 spine. Id.

18     X-rays taken of the bilateral hips, pelvis, and lumbosacral

19 spine showed mild disk space narrowing at the lumbosacral spine and

20 very minimal joint space narrowing at the right hip joint. Tr. 292.

21 Dr. Carlson thought Ms. Lemke offered a "complex presentation,"

22 since by history, her symptoms were suggestive of a radiculitis,

23 but no neurologic deficits were found on physical examination. Id.

24 Dr. Carlson thought other possibilities might be a hip joint

25 pathology or plexopathy, though these seemed "somewhat less

26 likely." Id.

27

28 FINDINGS AND RECOMMENDATION Page 5

Dr. Carlson ordered an MRI of the lumbosacral spine. Id. He suggested that she continue with the anti-inflammatory Relafen as her primary pain medication and that she try to stay as active as possible with her current exercise program. Id.

On June 6, 2002, Ms. Lemke was seen by Brett Stacey, M.D., at the OHSU Pain Management Center, and a physical therapist, Jennifer Abel. Tr. 275. Ms. Lemke told Dr. Stacey that standing on hard surfaces at work was painful and she needed to cut her work hours. She rated her average pain as three or four on a sale of 10, but said that with significant activity, the pain could go as high as 10/10. Id. Dr. Stacey recorded that the MRI showed no significant stenosis or foraminal encroachment, but did show facet changes. Tr. 276. Dr. Stacey's diagnostic impression was that Ms. Lemke had a combination of mechanical and myofascial low back and pelvic pain, along with deconditioning and deactivation. Id. Dr. Stacey thought the clinical picture complicated by Ms. Lemke's work and vocational issues and her history of depression. Id. Ms. Lemke said she had difficulty with her memory; when Dr. Stacey asked Ms. Lemke to remember three options, she was able to remember only two. Id.

Dr. Stacey and Ms. Abel recommended that Ms. Lemke begin physical therapy to decrease the myofascial component of her pain, and then, after two to three weeks of physical therapy, try a diagnostic medial branch block to see if anesthetizing the facet joints resulted in significant pain relief. Id. Dr. Stacey thought it would be reasonable to change Ms. Lemke to a long acting opioid on a fixed schedule, with one option being MS Contin. Id.

FINDINGS AND RECOMMENDATION Page 6

Ms. Lemke freely admitted to Dr. Stacey that her mood and her pain affected each other, but said she was not interested in seeing a psychologist. Tr. 277.

On June 14, 2002, Ms. Lemke was seen again by Dr. Carlson. Tr. 289. Dr. Carlson wrote that the MRI of the lumbosacral spine showed mild to moderate lumbosacral facet and ligamentous hypertrophy with some disk desiccation. Id. In Dr. Carlson's opinion, films of Ms. Lemke's pelvis had not shown significant pathology to relate her prior pelvic fracture to her current pain. Id. Dr. Carlson's diagnosis was facet arthropathy. Id.

On July 10, 2002, Ms. Lemke saw Dr. Muchowski for night sweats and fatigue. Tr. 244. Chest x-rays showed no acute disease; increased heart size in one view was related to chest wall deformity and was considered "probably not true cardiomegaly." Tr. 242. No masses, pleural efflusions or other abnormalities were seen. Id.

On August 6, 2002, Ms. Lemke saw John Ely, M.D., who started her on Celexa for depression. Tr. 240-41.

On September 6, 2002, Ms. Lemke was seen by Dr. Stacey and Sara L. Youngman, M.D. Tr. 278. Ms. Lemke said that ever since the accident, she had had low back pain "that is quite severe about 6 days of the month," as well as numbness in her right leg and foot. Id. She described her current pain as a five on a 10-point scale, varying from two to 10/10. Id. She said the pain was severe about six days of the month, and she believed this was mostly associated with the weather. Id. Her pain was made worse with standing for

FINDINGS AND RECOMMENDATION Page 7

1   long periods of time and was improved with medication. <u>Id.</u> She was

2   working on a reduced schedule, about 25 hours a week. <u>Id.</u> Her other

3   activities included walking, swimming, camping, farming, baseball

4   and dune buggying. Tr. 279.

5      On October 3, 2002, Ms. Lemke saw Heather Paladine, M.D., a

6   primary care physician. Tr. 237. She described chronic low back

7   pain since the accident, as well as right leg weakness, and

8   numbness and tingling in the right foot, although the weakness had

9   improved with physical therapy. Ms. Lemke related that the doctors

10   at the OHSU Pain Management Clinic had recommended long-acting

11   narcotics, and that she had been started on MS Contin 15 mg. twice

12   a day, along with Darvocet for breakthrough pain. <u>Id.</u> Ms. Lemke

13   said she needed to take the Darvocet quite frequently. <u>Id.</u>

14      Ms. Lemke reported that she was working full time at a deli,

15   but that back pain interfered with her work. She had full range of

16   motion in her back, although with discomfort over the sacroiliac

17   joints. Ms. Lemke's MS Contin dosage was doubled; Dr. Paladine was

18   hopeful that Ms. Lemke would be able to decrease her pain

19   medication after more treatment through the Pain Management Clinic.

20   <u>Id.</u>

21      On October 25, 2002, Dr. Stacey performed a lumbosacral

22   radiofrequency denervation. Tr. 233, 281, 284. After the procedure,

23   Ms. Lemke reported to Dr. Paladine that the pain in her back had

24   greatly decreased, and that she wished to start "weaning off her MS

25   Contin." Tr. 233. On November 4, 2002, she was taking 30 mg. of MS

26   Contin twice a day and four oxycodone per day. <u>Id.</u>

27

28   FINDINGS AND RECOMMENDATION Page 8

Dr. Paladine decided to discontinue the MS Contin, but have Ms. Lemke continue to take the oxycodone as needed, as well as the Relafen and Skelaxin, a muscle relaxant. Id. Dr. Paladine was hopeful that Ms. Lemke could get off narcotic pain medication completely after she finished treatment in the Pain Management Clinic. Id. Dr. Paladine reduced Ms. Lemke's Celexa to 20 mg per day and added Wellbutrin, for both depression and smoking cessation. Id.

On November 12, 2002, Ms. Lemke was seen by Anthony Colantonio, M.D. Tr. 271. She reported feeling "awesome" for the first two weeks after the radiofrequency denervation on October 25, 2002, but that she began feeling lower back soreness after lifting a 40-pound box at work. Id. Nevertheless, she thought she was getting better every day. Id. Ms. Lemke estimated that she was between 70% and 100% improved in terms of back pain after the denervation procedure. Tr. 272.

On December 4, 2002, Ms. Lemke reported to Dr. Paladine that she was taking 30 mg. of MS Contin per day, but that she had used 100 oxycodone during the past two weeks. Tr. 231. Ms. Lemke said her pain had significantly improved, and that she was undergoing physical therapy and doing home exercises. Dr. Paladine wrote a prescription for another 200 oxycodone. Id.

On Jan. 9, 2003, Ms. Lemke told Dr. Paladine that she generally needed six to eight tablets per day of oxycodone on a workday and three tablets per day on her days off. Tr. 229. Ms. Lemke was also taking Skelaxin, Wellbutrin and Celexa. Id. She

FINDINGS AND RECOMMENDATION Page 9

1   reported her mood as good. Id.

2      On January 17, 2003, Ms. Lemke was examined by Dr. Stacey. Tr.
3 269. Ms. Lemke reported significant improvement in her pain. Tr.
4 270. Examination showed essentially normal range of motion in the
5 lumbar spine. Dr. Stacey thought Ms. Lemke had obtained reasonable
6 results from the lumbar denervation, but her pain was nevertheless
7 persistent, with both myofascial and spondylitic components. Id.
8 Dr. Stacey encouraged her to continue exercising at home on a daily
9 base and discussed with her an activity program which could be
10 daily walking, swimming, yoga, aerobics, Tai Chi or any other
11 program, three times a week or more frequently if possible. Id. Dr.
12 Stacey advised that the goal was to increase her overall health and
13 muscle conditioning.

14      On February 6, 2003, Ms. Lemke saw Dr. Paladine. Tr. 227. Ms.
15 Lemke said her pain had been worse for the past three or four days
16 after doing some lifting at work. Id. Ms. Lemke estimated that she
17 was taking 20 oxycodone tablets on a work day and 9 to 10 tablets
18 on non-work days. Id. Ms. Lemke reported that the Pain Management
19 Clinic had suggesting changing her narcotic medication to Kadian
20 (extended release morphine sulfate). Dr. Paladine increased the
21 dosage of MS Contin so that Ms. Lemke would not need to take so
22 much oxycodone. Id. Ms. Lemke reported that her mood was good. Id.

23      On March 6, 2003, Ms. Lemke saw Dr. Paladine. Tr. 226. She was
24 on a medication contract for 45 mg. of MS Contin in the morning and
25 15 mg. in the evening. Ms. Lemke was also taking 300 oxycodone per
26 month for breakthrough pain. Id. Ms. Lemke reported that since her

27

28 FINDINGS AND RECOMMENDATION Page 10

1  last visit her back had become much worse. Id. Dr. Paladine
2  discussed Dr. Stacey's suggestion that Ms. Lemke be switched to
3  Kadian, a longer acting narcotic than MS Contin. Ms. Lemke was
4  started on Kadian 60 mg. per day. She was encouraged to contact the
5  Pain Management Clinic for a follow up visit. Id.

6      Dr. Paladine wrote that Ms. Lemke was currently on Celexa and
7  Wellbutrin, but that Ms. Lemke thought the Celexa more helpful. Dr.
8  Paladine increased the Celexa dosage.

9      On March 22, 2003, Ms. Lemke was seen by Thomas Kowalkowski,
10 M.D., a pain specialist, and Dr. Stacey. Tr. 260. She said she was
11 receiving approximately 70% relief of her back pain from Kadian and
12 oxycodone. Id. On April 3, 2003, Ms. Lemke saw Dr. Paladine again,
13 tr. 225, whose notes reflect that Ms. Lemke continued on 10
14 oxycodone per day despite starting Kadian one month previously. Id.
15 Ms. Lemke reported her pain improved by the Kadian although she
16 continued to use all her oxycodone during the month she was on
17 Kadian. Id. Ms. Lemke was also taking Relafen, an anti-
18 inflammatory, and Skelaxin. Id. At her last visit her Celexa had
19 been increased from 20 to 40 mg per day, and Ms. Lemke reported
20 improved mood. Id. She was encouraged to stay active to counteract
21 the depression. Dr. Paladine noted that Ms. Lemke appeared to be
22 doing better. Id.

23     Ms. Lemke saw Dr. Kowalkowski on April 4, 2003. Tr. 268. Ms.
24 Lemke described her back pain as four on a scale of 10, and stated
25 that over the past few weeks her back pain had been returning. Id.
26 Ms. Lemke said her symptoms were worse with working and standing,

27

28 FINDINGS AND RECOMMENDATION Page 11

1  but that her medications decreased her symptoms by about 70%. Id.
2  Dr. Kowalkowski wrote that he had a long conversation with Ms.
3  Lemke with respect to acknowledging the presence of back pain and
4  the necessity of making a strong effort in physical therapy. Id.
5  Dr. Kowalkowski affirmed his diagnosis of lumbar facet arthropathy
6  and myofascial pain, and recommended physical therapy and
7  consideration of a repeat medial branch denervation. Tr. 269.

8      On April 15, 2003, Ms. Lemke was seen for a psychological
9  intake interview by Michelle Henninger, Ph.D. Tr. 263. Ms. Lemke
10 said she had had lower back pain since the accident, as well as
11 more recent upper back pain which began approximately two years
12 previously. Tr. 264. The pain was made worse by bending backward,
13 walking, climbing stairs, sitting, lifting, standing, being at
14 work, changes in the weather, and stressful situations. Id. Her
15 pain symptoms were somewhat alleviated by lying down, sitting,
16 walking, exercise, heat and medications. Ms. Lemke reported
17 difficulty with short term memory, which she attributed to "her
18 head injury in 1986."[2]  Ms. Lemke said she slept about eight or
19 nine hours per night, but still experienced fatigue and usually
20 napped 45 minutes to an hour during the day. Ms. Lemke reported a
21 history of depressed mood since childhood, including a history of

22 _____

23     [2] Although Ms. Lemke reported earlier in the interview with
24 Dr. Henninger that the accident involved a fractured pelvis, nose
   and right foot, tr. 264, Ms. Lemke subsequently told Dr.
25 Henninger that she was hit in the right temporal lobe area and
   experienced loss of consciousness for a few minutes. Tr. 264. Ms.
26 Lemke said she had received neuropsychological testing after the
   injury which showed short-term memory impairment, and that she
27 received rehabilitation and treatment for that injury. Id.

28 FINDINGS AND RECOMMENDATION Page 12

fleeting suicidal thoughts, but said her boyfriend was quite supportive. Tr. 265. Ms. Lemke reported that a doctor had told her she had bipolar disorder, but Dr. Henninger did not think Ms. Lemke met the criteria for bipolar disorder. Id. Similarly, although Ms. Lemke reported symptoms of post-traumatic stress disorder (PTSD) related to the car accident and to molestation during childhood by her grandfather, Dr. Henninger did not think Ms. Lemke met the full criteria for PTSD. Id.

Ms. Lemke said she had some psychological counseling "after her trauma mainly focused on cognitive rehabilitation." Tr. 265. She also had family counseling with her daughter between 1998 and 1999. Tr. 266.

Ms. Lemke reported that she began drinking when she was 11 years old, and that her peak use of alcohol was from 1990 to 1997. Id. She reported symptoms of alcohol dependence, but said her drinking had been significantly reduced since she began treatment at the Pain Management Clinic because she knew alcohol was contraindicated with her current pain medications. Id. Ms. Lemke reported a history of using illicit substances, including crystal methamphetamine and cocaine, saying that she had become addicted to cocaine. She attended outpatient drug treatment in 1997 for a year and had stopped using illicit drugs. Id.

On the Molon Behavioral Medicine Diagnostic Test, Ms. Lemke indicated substantially more depressive symptoms than a typical patient. Tr. 267. Dr. Henninger thought Ms. Lemke would respond to a program including psychological counseling and stress management.

FINDINGS AND RECOMMENDATION Page 13

1 Id. On the Beck Depression Inventory, Second Edition, she obtained
2 a score corresponding to a severe level of depressive symptoms
3 experienced during the previous week. Id. On the Beck Anxiety
4 Inventory, she obtained a score indicating mild symptoms during the
5 past week. Id.

6     Dr. Henninger's diagnoses were: mood disorder, not otherwise
7 specified (NOS); anxiety disorder, NOS; pain disorder associated
8 with both psychological factors and a general medical condition;
9 sleep disturbance associated with chronic pain; alcohol dependence
10 in partial remission; and cocaine dependence in full remission by
11 self report. Id. Dr. Henninger recommended that treating physicians
12 "[p]ursue narcotic medications with caution, given history of
13 alcohol and drug dependence;" consider individual psychotherapy
14 focus on pain management coping skills, mood management, stress
15 management and sleep hygiene; and follow up in four weeks. Tr. 267-
16 68.

17     Ms. Lemke had a follow up session with Dr. Henninger on April
18 22, 2003. Tr. 261. Ms. Lemke reported her pain improved and her
19 mood "much better." Id. However, her affect was still dysphoric and
20 tearful. Id. Another follow up appointment was scheduled for May
21 19, 2003. Tr. 262.

22     On May 1, 2003, Ms. Lemke saw Dr. Paladine, reporting that she
23 had been seeing a psychologist and a physical therapist regularly
24 at the Pain Management Clinic and finding them helpful. Tr. 224.
25 She reported her mood had improved somewhat since the last visit,
26 but her back pain had flared up. Id. The Pain Management Clinic had

27

28 FINDINGS AND RECOMMENDATION Page 14

1  not been able to give her specific work restrictions although they
2  were working on referring her to someone for that. Id. One of her
3  coworkers was on vacation so she had to work 40 hours a week. Id.
4  She was taking oxycodone very frequently, running out before the
5  end of the month. She felt the Kadian helped in terms of pain
6  control, but not enough. Id. Dr. Paladine noted that she was
7  concerned about Ms. Lemke "needing her oxycodone so frequently and
8  running out before the end of the month." Id. Dr. Paladine
9  increased Ms. Lemke's Kadian dosage to 100 mg. a day and Ms. Lemke
10  was given another 300 oxycodone tablets. Id.

11      On June 3, 2003, Ms. Lemke was seen by Dr. Paladine. Tr. 223.
12  Ms. Lemke said she was "doing better in terms of her pain," with
13  work "going well," and being able to get out and do some gardening.
14  Id. She was continuing to follow up with the psychologist at the
15  Pain Management Clinic and "finds this very helpful." Id. She hoped
16  to be able to cut down on her oxycodone. Id.

17      On June 23, 2003, Ms. Lemke saw Dr. Stacey. Tr. 220. Dr.
18  Stacey noted that there was "considerable improvement over the last
19  few visits," and that Ms. Lemke's current medication regimen was
20  "reducing her symptoms by approximately 75%." Id. Ms. Lemke stated
21  that she had been gardening three to four hours a day, and was
22  working on the exercise therapy twice a week for 30 minutes at a
23  time. Id. Dr. Stacey wrote that Ms. Lemke continued to "use
24  relaxation techniques she learned from our Pain Clinic," and she
25  was advised to "continue reading books that we have suggested for
26  stress coping management." Id.

27

28  FINDINGS AND RECOMMENDATION Page 15

1    On July 7, 2003, Ms. Lemke saw Dr. Paladine. Tr. 218. Dr.
2  Paladine wrote that Ms. Lemke was on a pain medication contract for
3  100 mg. of Kadian per day and 5 mg. of oxycodone 10 times a day.
4  Ms. Lemke reported that her back pain was "doing well," and that
5  she continued to "work 20 hours a day" [sic] as well as starting to
6  do more gardening. Ms. Lemke said she was "doing well at work." Dr.
7  Paladine noted that Ms. Lemke was continuing to see a psychiatrist
8  and physical therapist, but that the Pain Management Clinic
9  "feel[s] that medically her medication management is adequate and
10 has signed off." Id. Ms. Lemke said she was trying to taper down on
11 her oxycodone, and that she had 20 left that month. Id.

12    Dr. Paladine gave Ms. Lemke prescriptions for 30 Kadian and
13 300 oxycodone. Id. Dr. Paladine wrote, "I think our goals will be
14 to try to get her to continue her level of activity this summer and
15 be able to gradually taper down on the oxycodone." Id. Dr. Paladine
16 noted that the Pain Management Clinic was working to arrange an
17 evaluation to determine work restrictions. Id. Ms. Lemke was to
18 follow up in one month with her new primary care provider, Kar-Yee
19 Wu, M.D.

20    On August 6, 2003, Ms. Lemke saw Dr. Wu for refills of her
21 narcotic medications. Tr. 217. She reported that the Kadian and
22 oxycodone were "working out fairly well." Id. She took 12 oxycodone
23 and 100 mg. of Kadian per day. She reported that she had been
24 working with Physical Therapy and doing her stretching and
25 strengthening exercises on a regular basis. Id.
26 ///

27

28 FINDINGS AND RECOMMENDATION Page 16

On September 4, 2003, Ms. Lemke saw Dr. Wu for an episode of chest pressure. Tr. 213. Otherwise, she was feeling well and had no other particular complaints. Id. An EKG was "equivocal to borderline." Tr. 214. Ms. Lemke was advised to go to the emergency room for workup if she had another episode and was urged to stop all smoking. Id. Dr. Wu thought the current regimen of Kadian and oxycodone were working well for the chronic back pain, and that her depression was under good control with Wellbutrin and Celexa. Id.

On October 2, 2003, Dr. Wu noted that Ms. Lemke had normal gait and posture. Tr. 210. She was given refills of oxycodone and Kadian and Dr. Wu reviewed with her the importance of regular exercise and stretching. Id. On November 5, 2003, Dr. Wu refilled Ms. Lemke's prescriptions and again stressed the importance of exercise and smoking cessation. Tr. 209.

On February 2, 2004, Ms. Lemke saw Dr. Wu, reporting that her back pain had increased as a result of her job schedule and asking for a note giving her two days off from work at a time in order to keep her back pain under control. Tr. 207. Dr. Wu wrote that Ms. Lemke also did not think the Celexa was helping as much, and wanted to restart Wellbutrin. Id.

On March 1, 2004, Ms. Lemke told Dr. Wu her back pain had been worse over the past month, and that she had not been getting good relief from her regular pain medications. Tr. 206. Examination showed that Ms. Lemke had adequate range of motion of her back in all directions, but some tenderness over the paraspinous muscles with deep palpation. Strength was normal throughout and sensorium

FINDINGS AND RECOMMENDATION Page 17

1  was grossly intact. Id. Dr. Wu continued her on the current pain
2  regimen, but suggested that the prescriptions might change at a
3  follow up visit in a month. Id. Dr. Wu encouraged Ms. Lemke to use
4  heat, stretching, and exercise. Id.

5      On May 19, 2004, Ms. Lemke reported increased back pain,
6  saying she had quit her job because she was not able to keep up
7  with it. Tr. 204. Dr. Wu increased Ms. Lemke's Kadian dosage to 120
8  mg. Id. On June 16, 2004, Ms. Lemke saw Dr. Wu for prescription
9  refills and requested a note saying she could not do manual labor,
10  but was able to do other work. Tr. 201. She reported that she was
11  "keeping herself busy mostly by playing with her dog and
12  gardening." Id. Examination showed that Ms. Lemke's back pain was
13  slightly improved, with increased range of motion throughout. Id.
14  Dr. Wu noted that "overall, she does actually seem better than she
15  did on her previous visit." Id. A note was provided stating that
16  Ms. Lemke could sit for half an hour, but then needed a brief
17  break, and that she should not engage in any prolonged standing or
18  any heavy manual labor. Id.

19      On August 19, 2004, Dr. Wu wrote that Ms. Lemke was "overall
20  doing OK," but that there was "no great difference or spectacular
21  improvement" as a result of the increased dosage of Kadian. Tr.
22  199. Dr. Wu wrote that Ms. Lemke's depression was stable, without
23  worsening or improvement. Id.

24      X-rays of Ms. Lemke's lumbar spine on December 27, 2004,
25  showed mild disk space narrowing at L4-5 with some minimal anterior
26  straight osteophytes, but otherwise a normal lumbar spine. Tr. 194.
27
28  FINDINGS AND RECOMMENDATION Page 18

An MRI of the lumbar spine done on Dec. 30, 2004, tr. 247, showed no significant central canal or foraminal stenoses. There was disk desiccation with degenerative endplate changes at L4-L5. Id.

On December 27, 2004, Ms. Lemke's Kadian dose was increased to 130 mg., and she was continued on 300 oxycodone per month. Tr. 192.

On January 27, 2005, Dr. Wu wrote that Ms. Lemke reported that her pain was better and that she was trying to get back into exercising and engaging in more activity. Tr. 189. Her prescription for 300 oxycodone was refilled. Id.

On February 28, 2005, Dr. Wu wrote that overall Ms. Lemke reported "doing OK." Tr. 188. Ms. Lemke reported her pain at about five or six on a 10-point scale, "which is stable," but that "pain goes up to 10 with working." Id. [3] Dr. Wu wrote that Ms. Lemke's depression was stable and well controlled by the Celexa and Wellbutrin. Id.

On March 2, 2005, Ms. Lemke was evaluated by Kim Webster, M.D., a family practitioner, on behalf of Disability Determination Services (DDS). Tr. 145. Ms. Lemke related that in 1985, she was hit by a car and had a pelvic fracture. Id. Initially, she had fairly significant pain, which improved and then became worse. Id. Ms. Lemke currently rated her pain level as 6/10 and occasionally 8 or 10/10. Id. She said she was able to sit for about 20 minutes, stand for about 10 minutes, walk for about two blocks, and lift about one gallon of milk. Id. Her medications were Kadian,

---

[3]Although the record indicates that Ms. Lemke was no longer working as of that time.

FINDINGS AND RECOMMENDATION Page 19

1 Skelaxin, Relafen, Wellbutrin, and oxycodone. Id.

2    Dr. Webster noted that Ms. Lemke's gait when walking down the
3 hall was "this odd, wide-based, rocking back and forth, kyphotic
4 gait, rocking to the right more than the left." Tr. 146. On later
5 observation, Dr. Webster noted that Mr. Lemke rocked more to the
6 left than the right. Tr. 146-47. Dr. Webster observed that Ms.
7 Lemke could stand on each leg independently, "although there seemed
8 to be some histrionics in doing this and some poor effort." Tr.
9 147. Dr. Webster wrote that Ms. Lemke had no pain to mild
10 percussion of the lumbar spine, but significant discomfort with
11 axial loading and rotation at the shoulders. Tr. 148. She had good
12 muscle bulk, tone and strength in the upper and lower extremities.
13 Id. Dr. Webster rated her motor strength as 5/5 in the upper and
14 lower extremities. Id.

15    Dr. Webster's assessment was low back pain without any
16 neuromuscular deficits. Id. Dr. Webster noted "several positive
17 Waddell signs."[4] Dr. Webster's functional assessment was as
18 follows:

19        At this point, there is no appreciable objective evidence
20        that would limit her ability to stand, walks [sic], or

21

22    [4] Waddells signs are a group of eight physical signs (skin
discomfort on light palpation; tenderness across multiple somatic
23 boundaries; report of pain when the top of the head is pressed,
also referred to as axial loading; pain reported on rotating the
24 shoulders and pelvis together; absence of pain on distracted
straight leg raise; stocking distribution of sensory loss or
25 sensory loss in an entire extremity or side of the body; weakness
that is jerky, with intermittent resistance; and exaggerated
26 painful response to a stimulus), first described by Waddell G,
McCulloch JA, Kummel E, and Venner RM in "Nonorganic Physical
27 Signs in Low-Back Pain," Spine 5:117-25 (1980).

28 FINDINGS AND RECOMMENDATION Page 20

sit. There is no objective evidence for the need of an assistive device. There is no objective evidence that would limit her ability to lift and carry occasionally or frequently. This is based on objective findings, rather than the history. There is no objective evidence for the need of postural, manipulative, or environmental restrictions. The apparent spasm deformity in her lumbar spine seems to be inconsistent based on the way she walked while being observed... This, with the positive Waddell signs, and normal neuromuscular examination, leads me to believe there is a non-organic basis for her pain.

Tr. 148.

X-rays of the lumbar spine taken on March 2, 2005, showed slight narrowing of L4-L5, indicating a very early degenerative change, and some minimal narrowing of L2-L3 interspace, with mild arthritic changes. Tr. 144. These were characterized as "early degenerative changes." Id. Otherwise, the lumbar spine was normal. Id.

On March 8, 2005, Ms. Lemke was given a psychodiagnostic evaluation by Richard Kolbell, Ph.D., on behalf of DDS. Tr. 150. Dr. Kolbell observed that Ms. Lemke walked with a pronounced limp, but otherwise gait and station were normal. Id. Affect was somewhat labile, and she became tearful at various points throughout the evaluation. Id. Ms. Lemke told Dr. Kolbell that her prior psychiatric history included counseling in 1995 during rehabilitation from a traumatic brain injury sustained in a 1995 motor vehicle accident. Tr. 151, 152. Ms. Lemke described the 1995 injury as occurring while standing outside her car after being rear-ended. Tr. 152. She denied any other history of CNS insult. Id.

///

FINDINGS AND RECOMMENDATION Page 21

Ms. Lemke was able to track simple and conversational and ideational material adequately. Tr. 151. She could compute serial 3 subtractions up to 59 with two errors. Id. She was able to perform double digit mental arithmetic, making self corrections. Her fund of general information was average. Id. She could recall 3/3 items immediately and after a five-minute delay. Repetition of a compound, complex sentence was done without error. Id. Thought processing was logical, coherent and goal-directed. Id.

Ms. Lemke described back pain as her primary disabling condition, and secondarily noted some problems with memory "that seem to increase with her pain." Id. Her current medications were Wellbutrin, Skelaxin, Vicodin, Kadian and an NSAID. Id. Dr. Kolbell diagnosed Pain Disorder Associated with Psychological Factors and General Medical Condition; Dysthymia; Rule Out PTSD; and Alcohol Abuse, Reportedly in Remission. Tr. 153. Dr. Kolbell did not think there was "anything directly related to any brain injury or emotional/psychological trauma that in the past has prevented her from working." Id.

On March 17, 2005, neurologist Deborah Syna, M.D., wrote a letter to Ms. Lemke's primary care physician, Dr. Wu. Dr. Syna wrote that Ms. Lemke reported an increase in back pain during the previous six months, with a recent exacerbation in December 2004. Tr. 175. The pain eventually resolved with the addition of narcotics and muscle relaxants. Id. An MRI completed December 30, 2004 revealed lateral recess narrowing at L4-5, but no canal or foraminal stenosis; disk desiccation and degenerative changes at

FINDINGS AND RECOMMENDATION Page 22

1 L4-5 and L5-S1; and a probable right sacral Tarlov cyst. Id. Dr.

2 Syna characterized the MRI results as showing a "mild abnormality."

3 Id. Ms. Lemke's medication regimen was Wellbutrin, Relafen,

4 Skelaxin, oxycodone as needed for breakthrough pain, and 120 mg. of

5 Kadian daily. Tr. 176.

6 　　When Dr. Syna examined Ms. Lemke, she noted "[g]iveaway

7 weakness in the right lower extremity and "[p]ain behavior"

8 throughout the examination. Id. Dr. Syna's impressions were chronic

9 low back pain and evidence of mild right S1 radiculopathy. Tr. 177.

10 　　On March 28, 2005, Dr. Wu wrote that Ms. Lemke had increased

11 her activity, that her "spirits [were] doing well," that her "pain

12 [was] managed," and that in general, she "just feels better.". Tr.

13 186. Dr. Wu refilled her prescriptions and observed that Ms. Lemke

14 had "bright affect," and was "animated." Id.

15 　　On March 28, 2005, Dorothy Anderson, Ph.D. did a records

16 review on behalf of the Commissioner. Tr. 156. In Dr. Anderson's

17 opinion, Ms. Lemke had a pain disorder associated with

18 psychological factors and general medical condition, tr. 162, but

19 did not find any functional limitations. Tr. 166.

20 　　On May 27, 2005, Dr. Wu wrote that Ms. Lemke was doing more

21 exercise and eating better, which had caused her to lose weight.

22 Tr. 184. She felt the weight loss had helped her back pain. Id. Dr.

23 Wu wrote that Ms. Lemke was "no longer feeling sorry for herself."

24 Id. Ms. Lemke said she had days when she was able to be active,

25 then needed a day of rest. Id. Dr. Wu observed that Ms. Lemke was

26 in "better spirits," and "moving better." Id. Her prescriptions

27

28 FINDINGS AND RECOMMENDATION Page 23

1  were refilled. Id.

2      On July 21, 2005, Dr. Wu wrote that Ms. Lemke was "doing

3  better this month," as opposed to the previous month, but that she

4  had increased her pain medications on occasion. Tr. 181. Dr. Wu

5  thought that she was "overall doing OK." Id.

6      On January 13, 2006, Dr. Wu noted that she had made a

7  telephone call to Ms. Lemke regarding positive urinalyses for

8  methamphetamine and marijuana. Tr. 337. Ms. Lemke said she had been

9  advised to discontinue marijuana for pain relief. Id.

10     Drug abuse panels done on May 30, 2006, and June 28, 2006 were

11  positive for marijuana metabolites, as well as opiates and

12  morphine. Tr. 333, 335. A specimen tested on June 1, 2006 was

13  positive for marijuana metabolites, as well as opiates and

14  morphine. Tr. 336.

15     On August 29, 2006, Ms. Lemke established care with Mikeanne

16  Minter, M.D. Tr. 347. At that time, Ms. Lemke said she was taking

17  120 mg. of MS Contin per day and 5 mg. of oxycodone 10 times a day.

18  Id. Dr. Minter wrote that "a significant portion of our time spent

19  together" was spent talking about Ms. Lemke's high levels of pain

20  medication. Id. In addition, Ms. Lemke reported that she used

21  marijuana, though she did not have a medical marijuana card. Id.

22  Dr. Minter said that she did not participate in that program and

23  did not start patients on medical marijuana for the type of chronic

24  pain that Ms. Lemke had. Id. Dr. Minter encouraged Ms. Lemke to

25  stop the marijuana because of her depression. Id.

26  ///

27

28  FINDINGS AND RECOMMENDATION Page 24

1    On October 2, 2006, Ms. Lemke was seen by Benjamin Luman,
2  M.D., on a referral from Dr. Minter. Tr. 350. Ms. Lemke told Dr.
3  Luman that she had done very well after the accident until the year
4  2000, when she noted the onset of diffuse low back pain, with the
5  right side being worse than the left. Id. She stated that she
6  obtained excellent relief from the denervation until early 2005,
7  the onset of her current symptoms. Id. She described them as
8  diffuse right sided low back pain, localized in the sacral area, as
9  well as a pain extending from her left buttock in a L4 dermatomal
10 distribution to approximately above the knee. Id. She also
11 complained of occasional weakness with severe impact on her gait.
12 Id. Dr. Luman noted that Ms. Lemke was taking nitroglycerin for
13 chest pain, although in his opinion, she had "questionable coronary
14 artery disease," because a stress test had been read as within
15 normal limits. Id. Her routine medications also consisted of
16 Wellbutrin (bupropion), Feldene (piroxicam), an anti-inflammatory;
17 Robaxin (methocarbamol), a muscle relaxant; Kadian (morphine
18 sulfate), 120 mg. per day; and oxycodone as needed for breakthrough
19 pain. Tr. 351. Ms. Lemke said she "very rarely" needed the
20 nitroglycerin. Id.

21    Dr. Luman noted that an MRI dated September 24, 2006, tr. 356-
22 61, showed that at L4-5 there was a right paracentral disk bulge
23 that encroached on the neural foramen. This, coupled with
24 hypertrophic facet changes, caused "mild to moderate" right neural
25 foraminal stenosis. At L5-S1 there was a left paracentral disk
26 bulge which encroached on the neural foramen and which, coupled

27

28 FINDINGS AND RECOMMENDATION Page 25

with hypertrophic facet changes, also caused mild encroachment on the neural foramen. This study, in comparison with prior studies in December 2005 and July 2005, demonstrated that the "degenerative disk changes are stable and perhaps slightly more prominent than on previous studies." Tr. 352. However, the disk changes did not appear to cause significant stenosis of lumbar nerves, and, because her strength seemed well preserved, it was questionable whether she would benefit from decompression at these levels. Id. Dr. Luman thought Ms. Lemke had lumbosacral back pain of uncertain neurosurgical significance. Id.

Dr. Luman wrote that after consultation with Michael Dorsen, M.D., it was thought prudent to refer Ms. Lemke for nerve conduction studies to determine whether there was lumbar neural compression as opposed to lumbosacral chronic back pain. Tr. 352.

**Third Party Report**

Ms. Lemke's boyfriend and roommate, Doug Stone, submitted a third party report to the Commissioner dated January 5, 2005. Mr. Stone stated that he had known Ms. Lemke 5 1/2 years. Tr. 78. Mr. Stone reported that Ms. Lemke "stays in bed mostly, eats, showers, and tries to exercise some according to her doctors' instructions." Id. Mr. Stone said that Ms. Lemke frequently needed his assistance in feeding the cat, dressing, bathing, using the toilet, and getting to the kitchen table. Tr. 79. She was only able to prepare frozen dinners in the microwave. Tr. 80. Mr. Stone said she sometimes tried to do the laundry and in the summer time, she tried to water some of the outside plants, but that she moved slowly. Tr.

FINDINGS AND RECOMMENDATION Page 26

80. Her hobbies were watching TV and reading. Tr. 82. She did not have problems getting along with family, friends and neighbors. Tr. 82. Mr. Stone reported that Ms. Lemke's condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, remember, understand, and follow instructions. Tr. 83. He said Ms. Lemke sometimes used a brace for muscle spasms, but he did not report that she used a walker. Tr. 84.

Mr. Stone stated that Ms. Lemke told him that after her injury, the doctors told her she would probably never walk again, but with the help of her father, she was able to walk again. Tr. 85.

**Hearing Testimony**

At the hearing, November 9, 2006, Ms. Lemke testified that she last worked in March 2004, in a grocery store deli. Tr. 375. She stopped working because "I was crawling on the deli floor and the boss's son said it was time I needed to quit." Tr. 376. Ms. Lemke explained that she was crawling on the floor because the "pain in my hips and pressure gets so strong I can't be on my feet." Id.

She described pain in her hips, lower back, and sometimes down into her right leg, but "the very worst is in my hips and thighs." Id. She also had chest pain once a week, when she got "real frustrated or upset," for which she took nitroglycerin. Tr. 377. About three out of five days, during the daytime hours, she spent about ten hours a day lying down or sitting down. Tr. 378. Her symptoms were exacerbated by standing, bending, reaching to the

FINDINGS AND RECOMMENDATION Page 27

1  floor, and housecleaning. Tr. 379. She stated that she was able to
2  vacuum, but had to do it on her knees. Id. She continued to see Dr.
3  Wu every month, to obtain prescription refills. Id. At times, she
4  had used a walker at home, when "the pain is so bad I can't stand
5  to be on my feet, and I have to crawl to the restroom and stuff."
6  Id. She could carry no more than a gallon of milk. Id.

7      Ms. Lemke said she was able to sit about 15 to 20 minutes at
8  a time, and that she could stand about half an hour on grass, but
9  only about 10 minutes on concrete. Tr. 380. She could only walk
10  about 10 minutes at a time. Id. She was able to bend forward only
11  to about the height of a table. Tr. 381. She had difficulty
12  concentrating and remembering. Id. She slept about six hours a
13  night, tr. 383, but also napped almost every day for half an hour
14  to an hour and a half. Tr. 387. She grocery shopped about twice a
15  month. Tr. 384.

16      She took Wellbutrin for depression, which helped her. Tr. 386.
17  She said that at her next appointment with Dr. Wu, her morphine
18  dosage would be increased. Tr. 386.

19                          **ALJ's Decision**

20      The ALJ found that Ms. Lemke had the severe impairments of
21  disk protrusions, degenerative changes and stenosis at L4-S1 with
22  some cystic changes in the distal sacral canal. Tr. 23. He found
23  that Ms. Lemke had not established that her psychological
24  impairments of depression and/or pain disorder were severe, because
25  she had obtained good results from Wellbutrin and had not sought
26  counseling or other psychiatric care since 2003, nearly a year

27

28  FINDINGS AND RECOMMENDATION Page 28

prior to her alleged onset date.

The ALJ found no objective medical evidence that her use of alcohol, marijuana, or methamphetamine had a significant impact on her ability to function. Id. The ALJ found that Ms. Lemke's impairments did not meet or equal one of the listed impairments in 20 CFR Part 404, Subpt. P, App. 1. Tr. 24.

The ALJ found that Ms. Lemke was unable to return to her previous work, but that she retained the residual functional capacity to perform a range of sedentary work, lifting and carrying 10 pounds occasionally, less than 10 pounds frequently, standing and walking two hours in an eight hour work day, and sitting for six hours. Tr. 25. Mentally, she was able to perform simple, routine and repetitive tasks, interact appropriately with others, and respond appropriately to changes in the work setting and work routines. Id. The mental limitation was based, not on "any significant psychiatric impairment but a recognition of the fact that the claimant takes large quantities of narcotics and other medications such as muscle relaxants." Id.

The ALJ acknowledged that state agency evaluating medical consultants had opined that Ms. Lemke's physical impairments were "non-severe," but disagreed with these assessments because the consultants had not had the opportunity to consider Ms. Lemke's September 24, 2006 MRI study of her lumbar spine, and because it was

> apparent that the state agency consultants tend to
> improperly parlay the claimant's unreliable presentation
> during her consultative medical examination into the
> faulty conclusion that the claimant's symptoms must be

FINDINGS AND RECOMMENDATION Page 29

"non-severe." It does not necessarily follow that because there is evidence of symptom exaggeration, that the individual in question must have no significant symptoms. Individuals with significant symptoms are equally capable of exaggerating that effect. ... [T]here is ample objective evidence to indicate that the claimant has significant spinal impairment symptoms.

Id. However, the ALJ concluded that Ms. Lemke's allegations were not fully credible. He based this finding on 1) "modest and mixed" clinical studies showing, at most, "mild to moderate" stenosis, without clear evidence of impingement; 2) indications of feigned symptoms during medical examinations, including positive Waddell signs, "poor effort" during her consultative medical examination, and "giveaway" weakness; 3) inconsistencies in her own statements with respect to her use of illegal drugs, including denial of the use of illegal drugs in March 2005, an admission of current marijuana use in August 2006, and testing positive for marijuana and methamphetamine in June 2006; 4) inconsistencies in her reports of whether she did or did not sustain a closed head injury as a result of the accident; 5) inconsistent statements about a 1995 traumatic brain injury; and 6) several inconsistent statements about her education (sixth grade education, tr. 152; ninth grade education, tr. 263; eighth grade education, tr. 55). The ALJ also noted the inconsistency between Ms. Lemke's statement that she had not been able to get an examination by a neurosurgeon because she did not have medical insurance, when the medical record showed that her spinal impairments had been evaluated by two neurosurgeons, with treatment declined for medical, rather than financial reasons.

FINDINGS AND RECOMMENDATION Page 30

Tr. 350-52; 323.[5] The ALJ further found Ms. Lemke's credibility weakened by her request of Dr. Wu, on June 16, 2004, for a medical statement that she was unable to do "manual labor," but was able to do "other work instead," at a time when Ms. Lemke alleged that she was disabled.  Tr. 201. The ALJ characterized this as an admission against interest, particularly when she reported, at the same time, that she was "keeping herself busy mostly by playing with her dog and gardening," tr. 201, which suggested that Ms. Lemke had greater functional capacity than claimed. Tr. 27. The ALJ noted that Dr. Wu did prepare a statement for Ms. Lemke indicating that while Ms. Lemke was precluded from "heavy manual labor," Dr. Wu wrote that Ms. Lemke could otherwise work, subject to a sit/stand option, an assessment that was consistent with that of the ALJ.

The ALJ wrote that he had considered the third party report of Doug Stone, but found it not entirely credible because it omitted any mention of Ms. Lemke's substance abuse, particularly marijuana, and failed to report, consistent with Ms. Lemke's own statements, that she was able to garden, play with her dog, or perform work other than manual labor at times.

The ALJ concluded that Ms. Lemke is defined under Social Security regulations as a "younger individual," age 18-44, as of her alleged disability onset date. Considering her age and her

---

[5] The evidence cited by the ALJ indicates that one neurosurgeon, Dr. Dorsen, wanted to wait for a nerve conduction study before seeing Ms. Lemke. Tr. 352. Dr. West, the second neurosurgeon, declined a consult with Ms. Lemke, even though CareOregon had agreed to pay, because 1) there were no surgical lesions; 2) there was no canal or foramen involvement; and 3) there was no surgery available for a Tarlow cyst. Tr. 323.

FINDINGS AND RECOMMENDATION Page 31

1  education (which the ALJ found to be "limited,") work experience,
2  and residual functional capacity, she was able to perform a full
3  range of unskilled sedentary work. Tr. 28. The ALJ concluded that
4  Ms. Lemke's mental limitations would not restrict her ability to
5  perform sedentary unskilled work, by regulatory definition. Id. He
6  concluded that Ms. Lemke was not disabled.

7                              **Standard**

8      The court must affirm the Commissioner's decision if it is
9  based on proper legal standards and the findings are supported by
10 substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111,
11 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence
12 as a reasonable mind might accept as adequate to support a
13 conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971);
14 Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In
15 determining whether the Commissioner's findings are supported by
16 substantial evidence, the court must review the administrative
17 record as a whole, weighing both the evidence that supports and the
18 evidence that detracts from the Commissioner's conclusion. Reddick
19 v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the
20 Commissioner's decision must be upheld even if "the evidence is
21 susceptible to more than one rational interpretation." Andrews, 53
22 F.3d at 1039-40.

23     The initial burden of proving disability rests on the
24 claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d
25 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must
26 demonstrate an "inability to engage in any substantial gainful

27

28 FINDINGS AND RECOMMENDATION Page 32

activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the

FINDINGS AND RECOMMENDATION Page 33

1 third step. <u>Yuckert</u>, 482 U.S. at 141.

2     In step three, the Commissioner determines whether the
3 impairment meets or equals "one of a number of listed impairments
4 that the [Commissioner] acknowledges are so severe as to preclude
5 substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a
6 claimant's impairment meets or equals one of the listed
7 impairments, he is considered disabled without consideration of her
8 age, education or work experience. 20 C.F.R. s 404.1520(d),
9 416.920(d).

10     If the impairment is considered severe, but does not meet or
11 equal a listed impairment, the Commissioner considers, at step
12 four, whether the claimant can still perform "past relevant work."
13 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he
14 is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the
15 claimant shows an inability to perform his past work, the burden
16 shifts to the Commissioner to show, in step five, that the claimant
17 has the residual functional capacity to do other work in
18 consideration of the claimant's age, education and past work
19 experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f),
20 416.920(f).

21                            **Discussion**

22     Ms. Lemke challenges the Commissioner's decision on the
23 grounds that the ALJ erred in: 1) finding that her cardiac
24 impairment was not severe; 2) finding that her psychological
25 impairments were not severe; 3) failing to address the criteria of
26 the Listing of Impairments for mental impairments; 4) failing to

27

28 FINDINGS AND RECOMMENDATION Page 34

1  call a VE to determine the effect of nonexertional impairments on

2  her limitations; 5) failing to include in his residual functional

3  capacity assessment limitations found by Dr. Wu on June 16, 2004;

4  6) improperly assessing Ms. Lemke's credibility; and 7) improperly

5  rejecting the lay witness testimony of Doug Stone.

6      1.   Severity of coronary artery disease

7      Ms. Lemke asserts that the ALJ erred by not including her

8  cardiac impairment in his finding of severe impairments. An

9  impairment or combination of impairments can be found not severe

10  only if the evidence establishes a slight abnormality that has no

11  more than a minimal effect on individual's ability to work. Smolen

12  v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). Step two of the

13  sequential analysis has been described as a "de minimis screening

14  device used to dispose of groundless claims," id., and an ALJ may

15  find that a claimant lacks a medically severe impairment or

16  combination of impairments only when his conclusion is "clearly

17  established by medical evidence." Webb v. Barnhart, 433 F.3d 683,

18  687 (9th Cir. 2005), citing Social Security Ruling 85-28.

19      The medical evidence relating to Ms. Lemke's cardiac

20  complaints includes a chest x-ray taken in July 2002, showing no

21  acute disease and no masses, pleural effusions, or other

22  abnormalities, tr. 242; an EKG in September 2003 showing a single

23  flipped T-wave, which Dr. Wu found "equivocal to borderline," tr.

24  214; and a stress test within normal limits. Tr. 350. Dr. Luman

25  thought Ms. Lemke had "questionable coronary artery disease," even

26  though she had been prescribed nitroglycerin for chest pain. Id.

27

28  FINDINGS AND RECOMMENDATION Page 35

1  These objective clinical findings do not support a finding of
2  severe impairment. Further, Ms. Lemke told Dr. Youngman on
3  September 6, 2002, that she had chest pressure "that was evaluated
4  and that was found to be noncardiac in origin." Tr. 278.

5     Further, there is inconsistency in the record about the
6  frequency of Ms. Lemke's nitroglycerin use. In November 2006, Ms.
7  Lemke testified at the hearing that she takes nitroglycerin for
8  chest pain once a week, tr. 377, but only a month earlier, in
9  October 2006, Ms. Lemke had told Dr. Luman that she "very rarely"
10  needed the nitroglycerin. Tr. 351.

11     I find no error in the ALJ's conclusion that Ms. Lemke's
12  cardiac complaint was not severe.

13     2.   Psychological impairments

14     Ms. Lemke asserts that the ALJ erred in not finding her
15  psychological disorders severe. Ms. Lemke asserts that the opinions
16  of Doctors Kolbell and Henninger support a finding that all of Ms.
17  Lemke's psychological problems constitute a severe impairment, if
18  not individually, then at least in combination.

19     The ALJ found that Ms. Lemke had taken Wellbutrin or other
20  antidepressants for several years. This finding is based on
21  substantial evidence in the record. See, e.g., tr. 240-41 (started
22  on Celexa August 2002); tr. 233 (Wellbutrin added October 2002);
23  tr. 353 (still on Wellbutrin as of October 2, 2006). Moreover, the
24  record contains substantial evidence that Ms. Lemke reported these
25  medications as effective in alleviating her symptoms. See, e.g.,
26  tr. 229 (reporting that her mood was "good" on September 9, 2003);

27

28  FINDINGS AND RECOMMENDATION Page 36

tr. 260 (reporting improved mood on March 22, 2003 as result of increase in Celexa); tr. 261 (reporting improved mood on April 22, 2003); tr. 224 (reporting improved mood on May 1, 2003); tr. 213 (reporting to Dr. Wu on September 4, 2003 that depression under good control with Wellbutrin and Celexa); tr. 199 (note from Dr. Wu dated August 19, 2004, saying depression stable); tr. 188 (note from Dr. Wu dated February 28, 2005 saying depression stable and well controlled by Celexa and Wellbutrin); tr. 186 (observation by Dr. Wu March 28, 2005 that Ms. Lemke had "bright affect" and was reporting good spirits).

An impairment that is under control cannot support a finding of disability. Celaya v. Halter, 332 F.3d 1177, 1185 (9th Cir. 2003)(Rawlinson, J., dissenting); Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1992)(upholding ALJ's finding of no disability where the impairments were stabilized). The ALJ's conclusion that Ms. Lemke's psychological impairments were not severe because controlled by medication is free of error and supported by substantial evidence in the record.

Because the evidence demonstrates that Ms. Lemke's psychological impairments are well controlled by medication, I am unpersuaded by Ms. Lemke's arguments that the ALJ erred in failing to address whether Ms. Lemke met the criteria of the Listing of Impairments for Mental Impairments and that the ALJ erred in failing to call a vocational expert to determine the effect of the psychological impairments on Ms. Lemke's residual functional capacity.

FINDINGS AND RECOMMENDATION Page 37

3.    Limitation found by Dr. Wu

Ms. Lemke asserts that the ALJ erred in failing to include, in his residual functional capacity assessment, the limitation found by Dr. Wu that Ms. Lemke could sit for half an hour before needing a brief break and that she should not engage in any prolonged standing or heavy manual labor. Tr. 201.

I find this argument unpersuasive. First, the ALJ's findings that Ms. Lemke was limited to sedentary work and limited to standing no more than two hours of an eight hour day do not conflict with Dr. Wu's opinion that Ms. Lemke should not engage in prolonged standing or heavy manual labor. Second, elsewhere in the same chart note, Dr. Wu records that Ms. Lemke reported being able to do "other work" than "manual labor," a statement not necessarily in conflict with the ALJ's residual functional capacity assessment. The note as written by Dr. Wu does not appear in the record and nothing in the record suggests that Dr. Wu arrived at the limitations as stated in the note other than by having Ms. Lemke request them.

The ALJ may properly reject a physician's opinion that is given as a conclusory statement and unsupported by medical findings, personal observations, or test results, particularly when the opinion, as here, varies from the treatment notes and is worded ambiguously. See Burkhart v. Bowen, 856 F.2d 1335 (9th Cir. 1988); Meanel, 172 F.3d at 1111; Saelee v. Chater, 94 F.3d 520 (9th Cir. 1996). I find no error.

///

FINDINGS AND RECOMMENDATION Page 38

1      4.   Credibility findings

2      Ms. Lemke asserts that the ALJ erred in failing to provide

3  clear and convincing reasons for rejecting her testimony.

4      Once a claimant shows an underlying impairment and a causal

5  relationship between the impairment and some level of symptoms,

6  clear and convincing reasons are needed to reject a claimant's

7  testimony if there is no evidence of malingering. Smolen v. Chater,

8  80 F.3d 1273, 1281-82 (9th Cir. 1996). The only time the "clear and

9  convincing" standard does not apply is when there is affirmative

10 evidence suggesting that the claimant is malingering. Greger v.

11 Barnhart, 464 F.3d 968, 972 (9th Cir. 2006); Carmickle v.

12 Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008). However, the ALJ

13 need not make a specific finding of malingering. Carmickle 533 F.3d

14 at 1160.

15     In evaluating the credibility of symptom testimony, the ALJ

16 may consider factors such as the claimant's daily activities and

17 observations of treating and examining physicians and other third

18 parties regarding among other matters nature, onset, duration and

19 frequency of claimant's symptoms. Smolen v. Chater, 80 F.3d 1273

20 (9th Cir. 1996); Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir.

21 2001). The ALJ may also consider inconsistencies in testimony,

22 effectiveness or adverse side effects of any pain medication, and

23 relevant character evidence. Orteza v. Shalala, 50 F.3d 748 (9th

24 Cir. 1995).

25     The ALJ found, correctly, that the medical record contains

26 evidence of feigned symptoms and suspect presentation. In March

27

28 FINDINGS AND RECOMMENDATION Page 39

2005, Dr. Webster wrote that Ms. Lemke's gait was inconsistent upon more than one observation, tr. 146-47; that she demonstrated "histrionics" and "some poor effort," tr. 147; and that she exhibited several positive Waddell signs. Id. Dr. Syna noted "giveaway" weakness in the right leg and "pain behavior" throughout her examination on March 17, 2005. Tr. 176. The existence in the record of evidence of feigned or exaggerated symptoms may properly be used to question a claimant's credibility. Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001). Thus, the "clear and convincing" standard cannot be applied to the ALJ's credibility findings.

The ALJ further found Ms. Lemke's credibility diminished by inconsistent statements and actions, including 1) misrepresentation of her use of illegal drugs, such as marijuana and methamphetamine; 2) inconsistent reports about a closed head injury and receiving rehabilitation for the injury after the accident; 3) inconsistent statements about her education; 4) the untrue statement that lack of medical insurance precluded examination by a neurosurgeon, when the record disproved this; and 5) her statement to Dr. Wu on June 16, 2004, made after her alleged onset date of March 2004, that she was able to perform work other than heavy manual labor. These findings are all based on substantial evidence in the record.

The record indicates that Ms. Lemke has made many contradictory statements about the motor vehicle accident in which she initially injured her back, including, as the ALJ noted, inconsistencies about whether she sustained a closed head injury.

FINDINGS AND RECOMMENDATION Page 40

1  See, e.g., tr. 264 (closed head injury for which she received
2  rehabilitation and treatment); tr. 278 (same); tr. 176 (history of
3  head injury). Compare tr. 290 (statement that she received head
4  laceration); tr. 237 (no mention of head injury); tr. 350 (no
5  mention of head injury); tr. 264 (no mention of head injury); tr.
6  85 (report from Doug Stone that Ms. Lemke was told after injury she
7  would never walk again, but no reference to head injury).

8      As discussed above, Ms. Lemke has made inconsistent statements
9  about whether she completed the sixth, eighth, or ninth grade. Tr.
10 55, 62, 152, 263.

11     On September 11, 2006, Ms. Lemke made a statement to the
12 Commissioner that "I have something on my spine that I can't get
13 looked at by a neurosurgeon because I don't have insurance." Tr.
14 104. However, as the ALJ noted, the record disproves this
15 statement. Dr. West provided Ms. Lemke's physicians with three
16 medical reasons he did not feel he could treat her, even though
17 CareOregon had agreed to pay for a neurosurgery consultation. Dr.
18 Dorsen wanted a nerve conduction study done before a consultation.
19 See footnote 5 of these Findings and Recommendation.

20     The ALJ's adverse credibility finding based on Ms. Lemke's
21 statement to Dr. Wu on June 16, 2004 is based on substantial
22 evidence in the record. On that date, Dr. Wu wrote:

23         She is in the process for [sic] applying for social
           security disability. She would like a note saying that
24         she cannot do manual labor, but she is able to do other
           work instead. She is keeping herself busy mostly by
25         playing with her dog and gardening.

26 Tr. 201. Ms. Lemke alleged a disability onset date of March 27,

27

28 FINDINGS AND RECOMMENDATION Page 41

2004, which was before she made this statement to Dr. Wu.

I conclude that the ALJ's credibility findings are free of legal error and based on substantial evidence in the record.

5.   Rejection of lay witness testimony

Lay testimony as to a claimant's symptoms is competent evidence which the Commissioner must take into account, <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993), unless the ALJ expressly determines to disregard such testimony, in which case "he must give reasons that are germane to each witness." <u>Id</u>.

The ALJ considered Mr. Stone's testimony and gave reasons for rejecting his testimony that were germane to that witness. I find no error here.

**Conclusion**

I recommend that the decision of the Commissioner be affirmed.

**Scheduling Order**

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due December 22, 2008. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due January 5, 2009, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 8th day of <u>December</u>, 2008.

/s/ Dennis James Hubel

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 42

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    FINDINGS AND RECOMMENDATION Page 43